IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

UNITED STATES OF AMERICA

v.                                    CRIMINAL NO. 1:19-00159

ARUN DHAVAMANI

**MEMORANDUM OPINION AND ORDER**

The United States Court of Appeals for the Fourth Circuit remanded this case for this court to make a factual finding as to whether the doctrine of manufactured jurisdiction applies. More specifically, this court was directed to "make a finding of fact as to whether the Government deliberately manufactured jurisdiction solely to create federal adjudication of the case." (ECF No. 129, at 4-5.)  The court held an evidentiary hearing on the issue of manufactured jurisdiction on January 31, 2022, and took the matter under advisement.  The court concludes that the evidence—both at trial and at the evidentiary hearing—firmly establishes that the manufactured jurisdiction doctrine does not apply.

**I.   Background**

A single-count indictment charged defendant with Travel to Engage in Illicit Sexual Conduct in violation of 18 U.S.C. §§ 2423(b) and (e).  After a two-day jury trial on November 19-20, 2019, defendant was convicted.

Defendant appealed, arguing that the government had manufactured jurisdiction.  The Court of Appeals set forth the background as follows:

> This case arises from the work of a joint state and federal law enforcement taskforce that investigates Internet crimes involving children.  Law enforcement officers created a fictitious profile for a woman named "Ally" on Skout, a social media and online dating application.  Dhavamani used Skout to reach out to several women including "Ally," who was actually an undercover law enforcement officer.  "Ally's" profile listed her age as eighteen, but in subsequent communications via text, "Ally" told Dhavamani that her age was fifteen.
>
> The two agreed to meet in person; "Ally" chose the meeting location — the recreation center in Bluefield, West Virginia.  As Dhavamani drove to meet her, "Ally" changed the meeting place to just across the state border — the college tennis courts in Bluefield, Virginia, 1.3 miles from the original location.  Once at the new location, Dhavamani called "Ally" and received no answer.  As he began to drive back to West Virginia, law enforcement officers arrested him.

(ECF No. 129, at 3.)

The Court of Appeals reversed and remanded the case.  It found that this court plainly erred in overlooking Fourth Circuit precedent regarding the "manufactured jurisdiction doctrine," which "prohibits government agents from manipulating events to create the interstate element of a crime 'for the sole purpose of transforming a state crime into a federal crime.'"  (See ECF No. 129, at 4-5 (quoting United States v. Davis, 855 F.3d 587, 592 (4th Cir. 2017)).)

2

The Court of Appeals noted a conflict in the evidence as to whether jurisdiction had been manufactured:

> At trial, two law enforcement officers provided different explanations for the change in meeting location. Lieutenant Gary Weaver testified that: "There were a couple of concerns after we had set up that location. We had a couple of concerns. First of all, it was a summer night. A rec center, there may possibly be other kids around in that location and probably wasn't a -- tactically a good idea to have someone come in that was, you know, looking for a minor into that, so we tried to set up a different location that was a little bit more secure for us and for the general public." But State Trooper Jillian Yeager testified that the sole reason for changing the meeting location was to get Dhavamani across the state line and make this a federal case.

(Id. at 5.) Accordingly, the appeals court remanded the case for this court to make a factual finding as to whether the doctrine of manufactured jurisdiction applies. The essential question for the court to answer on remand is whether the government agents here "suppl[ied] the interstate element for the sole purpose of creating federal jurisdiction." (Id.)

## II. Legal Standard

The Court of Appeals set forth the relevant law as follows:

> In this circuit, the manufactured jurisdiction doctrine prohibits government agents from manipulating events to create the interstate element of a crime "for the sole purpose of transforming a state crime into a federal crime." United States v. Davis, 855 F.3d 587, 592 (4th Cir. 2017); see also United States v. Coates, 949 F.2d 104, 106 (4th Cir. 1991) (In finding manufactured jurisdiction, "[w]e rely entirely on the fact that the only reason the sole

3

jurisdictional link occurred here was that it was contrived by the government for that reason alone."); United States v. Brantley, 777 F.2d 159, 163 (4th Cir. 1985); United States v. Brinkman, 739 F.2d 977, 982 (4th Cir. 1984).

(ECF No. 129, at 4.)

### III. Factual Findings

The court held an evidentiary hearing to resolve the factual issue. Four witnesses testified at the hearing: Special Agent James Harrison, Lieutenant Gary Weaver, Detective Steven A. Sommers, and Trooper Jillian Yeager. No witness testified that the task force, or any member of the task force, changed the meeting location to create federal jurisdiction. The evidence established that creating federal jurisdiction was not even one reason for the change in the meeting location, let alone the sole reason.

**Special Agent James Harrison:** Agent Harrison ran the task force. He testified that one reason to change a meeting location is the presence of other people at the original meeting location. It is a collaborative effort among the task force members to change the site. In this case, a member of the task force had stated that people were present at the recreation center, so the site was changed. People were generally out and about the day of defendant's arrest.

Agent Harrison further recalled that it was his understanding, at the time the location was changed, that defendant had already crossed a state line by the time the decision to change the site was made.[1]

Agent Harrison further testified that those to whom he reported did not care whether the arrests that the task force made resulted in state or federal prosecutions—they just wanted arrests.

On cross-examination, Agent Harrison acknowledged that in another arrest made that day, the task force had moved the meeting location from a Subway restaurant in Virginia to a church in West Virginia, when the arrestee had traveled from Virginia. He did not testify that the change in that case was made to establish federal jurisdiction.

The court found Agent Harrison's testimony credible.

**Lieutenant Gary Weaver:** Lt. Weaver testified that, usually, a change in the meeting location is initiated by the subject of the investigation, not by the government agents. He testified that he was concerned about the recreation center as a

---

[1] The government did not rely on this theory of jurisdiction at trial, and the court does not rely on it now. Nevertheless, this testimony speaks to the lack of motivation of Agent Harrison to change the site to establish federal jurisdiction because, from what Agent Harrison understood at the time, there was probably already an interstate nexus.

meeting location in this instance based on his extensive experience with the Bridgeport Police Department. The recreation center in Bridgeport apparently tends to be very busy at times, and Lt. Weaver was concerned about traffic in and around the recreation center in Bluefield at the time of the proposed meeting. He relayed these concerns to at least one member of the task force and someone told him to change the meeting location to the Bluefield, Virginia location (the tennis courts). He does not recall the details of the conversation in which he raised his concerns or who told him to change the location, other than that it was not Trooper Yeager who proposed the new location. Lt. Weaver would not have chosen the new location because he was unfamiliar with it (and with the Bluefield area generally).

Lt. Weaver further testified that he felt no pressure to turn the investigation into a federal case.

The court found Lt. Weaver's testimony credible.

**Detective Steven A. Sommers:** Detective Sommers testified that there can be high foot and vehicle traffic around the recreation center, but he acknowledged that he did not personally observe heavy foot and vehicle traffic at the recreation center at the time the meeting with defendant was to occur. He further testified that the view of the tennis courts

6

was superior and that location was easier to control than the recreation center. He further testified to his understanding that when the task force used the recreation center for a different arrest that day, at a different time, there would have been less foot and vehicle traffic.

The court found Detective Sommers's testimony credible.

**Trooper Jillian Yeager:** Trooper Yeager testified that she assisted the task force by locating a base for its operations, conducting surveillance, and handling phone calls with subjects of investigation (portraying a minor female).

When asked about her testimony at trial, which included affirmative responses to defense counsel's requests for confirmation that the meeting location was changed to get defendant over the state line and create a federal case, Trooper Yeager testified that she misunderstood the two questions at issue. She was new to federal prosecutions and understood the questions to ask whether the change in meeting location was what established jurisdiction. She did not take the questions to ask her to confirm motivations for the change in location. The trial was her first time testifying in federal court.

Moreover, Trooper Yeager testified that she did not participate in discussions about setting or changing the meeting

7

place, and she had no knowledge concerning why the meeting location was changed.

On cross-examination, Trooper Yeager acknowledged that she had received chemotherapy treatment for cancer in 2020 and that such treatment had caused her some memory issues that are typical with such treatment. She referred to the phenomenon as "chemo brain." She maintained that she was not suffering from such memory issues relating to her testimony. Any trouble remembering certain details was due to the passage of time, not "chemo brain."

The court found Trooper Yeager's testimony credible.

**Overall finding:** The credible testimony of the members of the task force at the evidentiary hearing cleared up the conflict in the evidence at trial. The full evidence pertaining to the issue of manufactured jurisdiction establishes that creating federal jurisdiction was likely not even one reason for changing the meeting location from West Virginia to Virginia. It certainly was not the sole reason.

Trooper Yeager's explanation for the discrepancy between her trial testimony and her testimony at the evidentiary hearing was entirely credible. Accepting her explanation leaves essentially no evidence that jurisdiction was manufactured here. Moreover, the court finds credible Trooper Yeager's testimony at

8

the evidentiary hearing that she did not participate in the decision to change the meeting location and was not privy to why it was changed. There was no basis for her trial testimony on this topic. Therefore, that testimony does not support a conclusion that jurisdiction was manufactured.

**IV. Conclusion**

For the reasons stated above, the court **FINDS** that the government did not deliberately manufacture jurisdiction for the sole purpose of creating federal jurisdiction. In other words, the government agents did not change the meeting location to a different state for the sole purpose of making this a federal case.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record, to the United States Marshal for the Southern District of West Virginia, and to the Probation Office of this court.

**IT IS SO ORDERED** this 3rd day of February, 2022.

ENTER:

David A. Faber
Senior United States District Judge